IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT E. SAMUELS, | No. 2:10-CV-2689-LKK-CMK-P |
| Plaintiff, | |
| vs. | FINDINGS AND RECOMMENDATIONS |
| WOODS, et al., | |
| Defendants. | |
| _____/ | |

Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court is defendants' motion for summary judgment (Doc. 41).

### I. BACKGROUND

**A.    Plaintiff's Allegations**

This action proceeds on the original complaint filed on October 4, 2010. Plaintiff names the following as defendants: Woods, Maseret, Baker, Hernandez, Doud (erroneously sued a "Jeannie"), Silva, and Walker. Plaintiff claims that, on August 20, 2009, he was issued a "Permanent Lower Bunk Chrono" following a low back injury. Following this, plaintiff

1

informed defendant Hernandez of his need for a lower bunk and showed him the chrono.  He also states that he sent lower bunk requests to defendants Baker, Woods, and Maseret who never responded.  Plaintiff then filed an inmate grievance on September 17, 2009.  Plaintiff states that his grievance was never addressed.

According to plaintiff, on November 1, 2009, he "jumped from the top bunk to the table/stool" and "something 'popped'" in his knee causing severe pain.  Plaintiff states that defendant Jeanie, a prison nurse, looked at his knee the next morning and said she would refer plaintiff to the medical clinic once the doctor arrived.  Plaintiff states that he was never sent to the clinic.  Later that day during exercise time, plaintiff "limped" to the clinic but was turned away because he did not have an appointment.  Plaintiff returned to his cell and put in a request for a medical appointment.  Plaintiff states that on November 4, 2009, he again jumped from the top bunk and he felt his right knee buckle.  Plaintiff's cellmate yelled "man down" at which point defendant Hernandez arrived with a wheelchair and assisted plaintiff to the medical clinic.  At the clinic, a nurse applied ice and a bandage and provided medication.  Plaintiff states that the nurse told him the doctor would be called but that no doctor ever arrived.

Plaintiff states that he filed another grievance on December 12, 2009, attaching a copy of the low bunk chrono.  According to plaintiff, defendant Silva responded to this grievance.  Plaintiff claims that Silva denied the grievance because plaintiff had admitted to injuring himself by jumping from the top bunk.  Plaintiff faults Silva for never citing the low bunk chrono in the grievance decision.

Plaintiff next claims that in January 2010 he was approached by Hernandez about his grievance.  Plaintiff was asked to "sign off" on the grievance "in exchange for a bottom bunk."  Plaintiff states that he refused to bargain for something (the low bunk) that had been prescribed.  According to plaintiff, Hernandez "would later tell Sgt. Baker plaintiff was assigned to the bottom bunk . . . but slept on the top."  Plaintiff states that this is false.  Later, as part of the grievance process, plaintiff was interviewed by Baker who told plaintiff he did not recall being

informed earlier by plaintiff that plaintiff had a lower bunk chrono.  Plaintiff states that defendant Walker responded to his grievance by telling plaintiff that the table attached to the bunk should be used as a step and that inmates should not jump from the top bunk.  According to plaintiff, Walker knew that the tables were not attached to the bunks.

Plaintiff states that, "[a]fter months of pain and suffering. . . ," he was finally provided a bottom bunk on March 1, 2010.  Plaintiff claims that the conduct alleged above violated his rights to adequate medical care (Claim 1) and a safe living environment (Claim 2).

### B.     The Parties' Evidence

According to defendants, the following facts are undisputed:

1. At all relevant times, plaintiff was an inmate incarcerated at California State Prison – Sacramento ("CSP-SAC").

2. At all relevant times, defendant Doud was working as a licensed vocational nurse; defendant Silva was a correctional officer and Facility B appeals officer; defendant Hernandez was a correctional officer; defendant Masuret was a correctional counselor and supervisor; defendant Woods was a correctional counselor; defendant Baker was a correctional sergeant; and defendant Walker was the prison warden.

3. Plaintiff injured his back and right leg in October 2007 and received a "Comprehensive Accommodation Chrono (CDC 7410)" on August 20, 2009, affording him permanent lower bunk housing.

4. On November 1, 2009, plaintiff injured his right knee while jumping from the upper bunk to the stool of an adjacent desk attempting to reach the floor.

5. On November 4, 2009, plaintiff injured his right knee again, as well as his back, when he fell performing the same maneuver.

6. Defendant Hernandez responded to plaintiff's November 4, 2009, fall and rendered aid.

7. Plaintiff's claim against defendant Silva is based entirely on Silva having responded to plaintiff's inmate grievance relating to the November 4, 2009, fall.

8. Plaintiff's claim against defendant Walker is based entirely on his belief that, as prison warden, Walker permitted plaintiff to live in an unsafe environment (i.e., on the top bunk or a ladderless bunk).

///

9. Plaintiff's claim against defendants Woods and Masuret is based entirely on plaintiff's assertion that they failed to provide him a lower bunk after he submitted a written requested for one; plaintiff admits that he did not attach a copy of the CDC 7410 to his request; neither defendant Woods nor defendant Masuret ever received a copy of the CDC 7410 from plaintiff or anyone.

10. Defendant Baker, who reviewed plaintiff's inmate grievance at the first level, had no recollection of being informed by plaintiff, prior to his review of plaintiff's grievance, that he had a CDC 7410 chrono; as soon as defendant Baker learned of the chrono, he initiated the process of finding appropriate lower bunk housing for plaintiff.

11. Plaintiff never provided a copy of his CDC 7410 chrono to defendant Hernandez.

12. Defendant Walker's only involvement in plaintiff's case was to review his inmate grievance at the second level.

In his opposition, plaintiff begins by stating that he "adopts" the introduction to the case set forth in defendants' motion at pages 1-2, lines 21-28 and 1-3. In particular, plaintiff agrees with defendants' statement of the issues presented in this case as follows:

> . . .He [plaintiff] has filed claims under 42 U.S.C. § 1983 alleging that Defendants Doud, Silva, Hernandez, Masuret, Woods, Baker, and Walker (Defendants) were either deliberately indifferent to: (1) his serious medical needs (Doud, Silva, Hernandez, Masuret, Woods, Baker, and Walker), or (2) his conditions of confinement (Walker), or both, in violation of the Eighth Amendment, by refusing to honor his lower bunk medical chrono and permitting him to live in an inherently unsafe environment, causing him to sustain knee and back injuries when he jumped from his upper bunk to an adjacent stool while attempting to reach the floor of his cell.

Next, plaintiff argues that "admissible evidence" shows that his CDC 7410 chrono had been "distributed to his unit record, his correctional counselor, his central file, and given to floor staff." Based on this, he contends that the evidence shows that defendants Woods, Baker, Hernandez, and Masuret were aware of the existence of the chrono and plaintiff's serious medical need for a lower bunk assignment <u>prior</u> to the November 2009 falls. Plaintiff also claims that defendants failed to take necessary corrective steps after they became aware of the chrono in November 2009 because he was not provided a lower bunk housing assignment until

4

1  March 1, 2010 – over four months later.  Finally, as to plaintiff's repeated use of the jumping

2  maneuver to get down from the upper bunk, plaintiff states that ". . . there is not a way to get

3  down without being somehow suspended in the air."  Plaintiff also states that defendants'

4  statement that the bunk and stool are attached is false and demonstrates their "culpable state of

5  mind."

6        In support of his opposition, plaintiff attaches numerous documents from his

7  central file, as well as his own declaration.  Of note are the following:

8        1.    Defendant Woods' answer to plaintiff's interrogatory number one, set one, in which he states that, normally, chronos like plaintiff's CDC 7410

9            chrono, go to the floor officers for posting in their office.

10        2.    A section of what is apparently a job description memorandum, entitled "General Post Order Addendum," which specifies as follows: "It is

11            custody staff's responsibility to ensure that inmates are housed consistent with housing restrictions. . . ."; the addendum adds that it is prison

12            officials' responsibility to establish appropriate procedures to ensure inmates are housed according to their restrictions.

13

      3.    A diagram of the prison cell in which he was housed at the timed relevant

14            to this case, showing that the bunk beds are on the opposite wall from the desk and attached stool.

15

16

17  **II. STANDARD FOR SUMMARY JUDGMENT**

18        Summary judgment is appropriate when it is demonstrated that there exists "no

19  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

20  matter of law."  Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

21        . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings,

22        depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a

23        genuine issue of material fact.

24        <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

25

26  / / /

5

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary

1  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

2  genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

3  committee's note on 1963 amendments).

4        In resolving the summary judgment motion, the court examines the pleadings,

5  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

6  any.  See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See

7  Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed

8  before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

9  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

10  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

11  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

12  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

13  show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

14  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

15  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

16

17                      **III.  DISCUSSION**

18        Defendants argue that there is no evidence of deliberate indifference to either

19  plaintiff's medical needs or his safety.  Defendants also argue that they are entitles to qualified

20  immunity.

21      **A.**      **Merits**

22        The treatment a prisoner receives in prison and the conditions under which the

23  prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel

24  and unusual punishment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan,

25  511 U.S. 825, 832 (1994).  The Eighth Amendment ". . . embodies broad and idealistic concepts

26  of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102

(1976). Conditions of confinement may, however, be harsh and restrictive. See Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Nonetheless, prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986). A prison official violates the Eighth Amendment only when two requirements are met: (1) objectively, the official's act or omission must be so serious such that it results in the denial of the minimal civilized measure of life's necessities; and (2) subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of inflicting harm. See Farmer, 511 U.S. at 834. Thus, to violate the Eighth Amendment, a prison official must have a "sufficiently culpable mind." See id.

        1.     Medical Needs

Plaintiff's first claim proceeds as against defendants Silva, Hernandez, Masuret, Baker, and Woods only. Plaintiff has requested that defendant Doud be voluntarily dismissed from the action (see Doc. 23), and has conceded that Walker is not a defendant to this claim.

Deliberate indifference to a prisoner's serious illness or injury, or risks of serious injury or illness, gives rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 105; see also Farmer, 511 U.S. at 837. This applies to physical as well as dental and mental health needs. See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982). An injury or illness is sufficiently serious if the failure to treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and wanton infliction of pain." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992); see also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994). Factors indicating seriousness are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2) whether the condition significantly impacts the prisoner's daily activities; and (3) whether the condition is chronic and accompanied by substantial pain. See Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc).

///

///

The requirement of deliberate indifference is less stringent in medical needs cases than in other Eighth Amendment contexts because the responsibility to provide inmates with medical care does not generally conflict with competing penological concerns. See McGuckin, 974 F.2d at 1060. Thus, deference need not be given to the judgment of prison officials as to decisions concerning medical needs. See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989). The complete denial of medical attention may constitute deliberate indifference. See Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986). Delay in providing medical treatment, or interference with medical treatment, may also constitute deliberate indifference. See Lopez, 203 F.3d at 1131. Where delay is alleged, however, the prisoner must also demonstrate that the delay led to further injury. See McGuckin, 974 F.2d at 1060.

At the outset, it is undisputed that plaintiff was issued a CDC 7410 lower bunk chrono.[1] It is also undisputed that plaintiff was housed in an upper bunk at the time he fell in November 2009. The central issue remaining is whether defendants knew or should have known about the CDC 7410 chrono before November 2009. As defendants state: "Absent admissible evidence that Defendants had prior knowledge of Plaintiff's entitlement to a lower bunk, they could not have reasonably foreseen that being deprived of a lower bunk could lead to Plaintiff's injuries."

Defendants deny any knowledge of plaintiff's CDC 7410 chrono prior to his falls in November 2009. As discussed above, plaintiff has attached to his opposition the "General Post Order Addendum" to an apparent job description memorandum indicating that prison staff – which would include defendants – is responsible for ensuring that inmates are housed consistent with their medical restrictions, and that prison staff is responsible for establishing procedures to effect this housing policy. This document, if authenticated, would tend to indicate that

---

[1] While defendants object to plaintiff's statement of fact that he was issued a permanent lower bunk chrono in August 2009, they list this fact in their own statement of undisputed facts.

9

defendants either actually knew of plaintiff's lower bunk chrono, or at the very least should have been aware of the chrono before plaintiff's November 2009 falls.

Additionally, a document attached to plaintiff's complaint (Exhibit 1, page 12) is a copy of the CDC 7410 lower bunk chrono dated "8/20" with the word "Woods" written on the bottom. Again, if authenticated and supported with proper foundation, this document could indicate that defendant Woods knew of the chrono, perhaps as early as the date it was initially issued on August 20, 2009. This would also put into dispute defendants' assertion that Woods did not learn of the chrono until after plaintiff fell in November 2009, as well as the assertion by defendants Woods and Masuret that neither of them received a copy of the CDC 7410 from plaintiff or anyone.

Also consistent with plaintiff's assertion that defendants actually or constructively knew about the CDC 7410 chrono is defendant Woods' discovery response in which he states that "normally" chronos such as plaintiff's would be posted in the floor officer's office. The reasonable inference to be drawn from this is that plaintiff's chrono was posted and defendants ignored it until after plaintiff's falls in November 2009.

The court concludes that plaintiff has met his burden in opposing defendants' motion for summary judgment by presenting evidence which, if true, would create a genuine dispute as to if and when defendants Woods and Masuret knew about the lower bunk chrono.[2]

///
///
///

---

[2] Defendants interpose the following boilerplate objection to plaintiff's evidence: "Defendants object that the supporting evidence is ambiguous, speculative, assumes the truth of a fact not yet admitted into evidence, misstates evidence, lacks a proper foundation, is hearsay not subject to any recognized exception, and lacks authentication." Because plaintiff's evidence is to be believed, and because reasonable inferences suggested by facts asserted by the party opposing summary judgment must be drawn in favor of the opposing party, defendants' objections are overruled for purposes of summary judgment. The objections, however, are preserved for any later proceedings in this case.

This, however, does not end the analysis because plaintiff has admitted that his claim against defendants Silva, Baker, and Hernandez is based entirely on these defendants' alleged conduct <u>after</u> the falls in November 2009. Plaintiff's Eight Amendment medical care claim is based on his allegation that defendants had either actual or constructive knowledge of the chrono, that defendants intentionally ignored the chrono, and that this deliberate indifference resulted in the injuries he sustained from the falls in November 2009. Logically, anything that happened after that has no bearing on this claim. Thus, none of the conduct of defendants Silva, Baker, or Hernandez – who reviewed plaintiff's inmate grievance concerning the November 2009 falls – could have resulted in the claimed constitutional violation.

In sum, the court finds that there is a triable issue of fact with respect to whether and when defendants Woods and/or Masuret knew about plaintiff's CDC 7410 lower bunk chrono.[3] There is, however, no basis for liability against defendants Silva, Baker, or Hernandez.

        2.     <u>Safety</u>

The Eighth Amendment also imposes on prison officials a duty to take reasonable steps to protect inmates from physical harm. See <u>Hoptowit v. Ray</u>, 682 F.2d 1237, 1250-51 (9th Cir. 1982); <u>Farmer</u>, 511 U.S. at 833. Liability exists only when two requirements are met: (1) objectively, the prisoner was incarcerated under conditions presenting a substantial risk of serious harm; and (2) subjectively, prison officials knew of and disregarded the risk. See <u>Farmer</u>, 511 U.S. at 837. The very obviousness of the risk may suffice to establish the knowledge element. See <u>Wallis v. Baldwin</u>, 70 F.3d 1074, 1077 (9th Cir. 1995). Prison officials are not liable, however, if evidence is presented that they lacked knowledge of a safety risk. See <u>Farmer</u>,

---

[3] Defendants each state that they did not know of the lower bunk chrono. They also appear unaware of who had the responsibility of ensuring that inmates are housed consistent with applicable medical chronos. This, of course, presents a situation in which prison officials could always be shielded from liability by never having any actual knowledge of or responsibility for particular chronos. A medical-needs chrono could be issued and disappear into the ether with no recourse for the inmate, making the chrono useless. Put another way, the responsibility to ensure that inmates are housed consistent with appropriate medical limitations should rest with prison officials, not the inmate who has no control over his incarceration.

1   511 U.S. at 844.  The knowledge element does not require that the plaintiff prove that prison
2   officials know for a certainty that the inmate's safety is in danger, but it requires proof of more
3   than a mere suspicion of danger.  See Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 1986).
4   Finally, the plaintiff must show that prison officials disregarded a risk.  Thus, where prison
5   officials actually knew of a substantial risk, they are not liable if they took reasonable steps to
6   respond to the risk, even if harm ultimately was not averted.  See Farmer, 511 U.S. at 844.

7          Here, plaintiff concedes that the only defendant to his safety claim is defendant
8   Walker, the prison warden.  Plaintiff alleges that defendant Walker is liable for allowing a
9   dangerous condition to persist.  Defendants first argue that the gravamen of plaintiff's claim is
10  ". . .Walker's failure, as warden, to mandate the installation of ladders on CSP-SAC's bunk beds
11  created a hazardous condition of confinement. . . ."  The court finds that this characterization of
12  plaintiff's claim is too narrow.  As defendants acknowledge in their own separate statement of
13  undisputed facts, plaintiff's deposition testimony reveals that the basis of his claim is that
14  ". . . Walker . . . permitted plaintiff to live in an unsafe environment (i.e., on the top bunk of a
15  ladderless bunk)."  Thus, the more broad basis of plaintiff's claim is that his living environment
16  was unsafe in general.  More particularly, plaintiff claims that this unsafe environment was partly
17  due to the lack of ladders.  Plaintiff's claim against defendant Walker also necessarily includes a
18  component relating to whether sufficient policies and/or procedures were implemented at the
19  prison to ". . .ensure that inmates are housed consistent with housing restrictions. . ." (quoting
20  from the "General Post Order Addendum" discussed above).  This is so, logically, because the
21  danger to plaintiff created by the lack of ladders derives from his assignment to a top bunk
22  despite the existence of a lower bunk chrono.  In other words, had plaintiff not been assigned to a
23  top bunk, he would not have had occasion to require any ladders.
24  / / /
25  / / /
26  / / /

With a broader characterization of plaintiff's claim in mind, the court next addresses defendants' argument that ". . . in this case there is no admissible evidence that Plaintiff faced [a legitimate] threat of harm." The court does not agree. Here, the threat to plaintiff's safety arose from his being assigned a top bunk despite the CDC 7410 chrono. There is no dispute that plaintiff has a legitimate medical need for a lower bunk chrono. Given the reason for such a chrono in the first place – to avoid the type of injury which occurred in this case as a result of plaintiff's assignment to a top bunk – it stands to reason that the safety risk is also legitimate (if not obvious).[4]

Going to the heart of the claim – why plaintiff was not assigned a lower bunk in the first place – defendants argue:

> . . . Plaintiff offers no admissible evidence of any systemic problem at the prison that would have been sufficient to put Walker on notice such that he could have prevented the ensuring harm to Plaintiff.

Again, the court does not agree. As discussed above, there is evidence that prison officials are affirmatively responsible for implementing policies and procedures to ensure that inmates are housed consistent with their medical limitations. It is undisputed that plaintiff was assigned a top bunk despite his lower bunk chrono. It is reasonable to infer from the foregoing that either insufficient policies and procedures were in place, or no policies or procedures were in place, regarding medical limitations on bunk assignments. Further, according to defendants, no one had responsibility for ensuring proper bunk assignments, and no one knew whose responsibility it was. From this it is also reasonable to infer that, as prison warden, defendant Walker bore ultimately responsibility for the implementation of prison policies and procedures relating to

---

[4] The court recognizes that other mechanisms may have contributed to plaintiff's injury. Specifically, defendants argue that it was plaintiff's use of the jumping maneuver that caused his injury. This argument would go to the appropriate measure of damages based on plaintiff's own contributory conduct, and not to liability. To the extent defendants argue that plaintiff's contributory conduct extinguishes their liability as a matter of law, the court does not agree because a jury could find that the jumping maneuver was necessitated by the lack of ladders which in turn posed a safety risk for inmates, such as plaintiff, who are inappropriately assigned top bunks.

bunk assignments.

**B. Qualified Immunity**

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In general, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). In ruling upon the issue of qualified immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right. See Saucier v. Katz, 533 U.S. 194, 201 (2001). If a violation can be made out, the next step is to ask whether the right was clearly established. See id. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." Id. "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 202 (citation omitted). Thus, the final step in the analysis is to determine whether a reasonable officer in similar circumstances would have thought his conduct violated the alleged right. See id. at 205.

When identifying the right allegedly violated, the court must define the right more narrowly than the constitutional provision guaranteeing the right, but more broadly than the factual circumstances surrounding the alleged violation. See Kelly v. Borg, 60 F.3d 664, 667 (9th Cir. 1995). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand [that] what [the official] is doing violates the right." See Anderson v. Creighton, 483 U.S. 635, 640 (1987). Ordinarily, once the court concludes that a right was clearly established, an officer is not entitled to qualified immunity because a reasonably competent public official is charged with knowing the law

governing his conduct. See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982). However, even if the plaintiff has alleged a violation of a clearly established right, the government official is entitled to qualified immunity if he could have ". . . reasonably but mistakenly believed that his . . . conduct did not violate the right." Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001); see also Saucier, 533 U.S. at 205.

The first factors in the qualified immunity analysis involve purely legal questions. See Trevino v. Gates, 99 F.3d 911, 917 (9th Cir. 1996). The third inquiry involves a legal determination based on a prior factual finding as to the reasonableness of the government official's conduct. See Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir. 1995). The district court has discretion to determine which of the Saucier factors to analyze first. See Pearson v. Callahan, 555 U.S. 223, 236 (2009). In resolving these issues, the court must view the evidence in the light most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff. Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

For the reasons discussed above, the court rejects defendants' contention that "[e]ach of Plaintiff's constitutional claims is meritless." To the contrary, there is sufficient evidence which, if believed by a jury, could entitle plaintiff to an award of at least nominal damages. The court also disagrees with defendants' contention that "there is no evidence that any of Defendants' actions toward Plaintiff violated any of Plaintiff's clearly-established legal rights" because their actions were "consistent with CDCR or CSP-SAC (or both) policies and procedures." Again to the contrary, there is some evidence from which it could be reasonably inferred that deficient policies were in place, or no policies were in place. Or, it is possible that sufficient policies were in place but that defendants ignored them when assigning plaintiff to a top bunk. These are questions for a jury.

/ / /

/ / /

/ / /

## IV. CONCLUSION

Based on the foregoing, the undersigned recommends that:

1. Defendant Doud (erroneously sued as "Jeannie") be dismissed voluntarily on plaintiff's request;

2. Defendants' motion for summary judgment (Doc. 41) be construed as a motion for summary adjudication and, so construed, be granted in part and denied in part;

3. Summary adjudication be granted in favor of defendants Silva, Baker, and Hernandez;

4. Summary adjudication be denied as to defendants Woods and Masuret on plaintiff's medical needs claim;

5. Summary adjudication be denied as to defendant Walker on plaintiff's safety claim; an

6. All other pending motions (Docs. 21, 45, and 49) be denied as moot.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with these findings and recommendations, any party may file written objections with the court. Responses to objections shall be filed within 14 days after service of objections. Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: February 20, 2013

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE